[Crim. No. 6346.   Second Dist., Div. One.   Jan. 5, 1959.]

THE PEOPLE, Respondent, v. SYLVESTER HINTON, JR., et al., Defendants; ROBERT LEE JACKSON et al., Appellants.

744

Lloyd C. Griffith for Appellants.

Edmund G. Brown, Attorney General, and William E. James, Assistant Attorney General, for Respondent.

FOURT, J.—This is an appeal by Robert Lee Jackson from an order denying a motion for a new trial, from an order denying his application for probation, from an order that he be confined in the state prison and from a judgment finding him guilty of kidnapping, rape and a violation of section 288a, Penal Code. It is also an appeal by Robert Reginald Cozine upon the same grounds and from the same charges.

In an information filed in Los Angeles County each of the above named defendants was charged with seven counts of crime. The first count charged that the defendants stole and took one Louise Van Eyk and carried her from one part of Los Angeles County to another part of the same county, in violation of section 207, Penal Code (kidnapping). The second, fourth and sixth counts charged each defendant, among other

things, with a violation of section 261, subdivision 4, Penal Code (rape), in that each of said defendants had an act of sexual intercourse with Louise Van Eyk without her consent and against her will. The third, fifth and seventh counts alleged, among other things, that the defendants respectively participated in the act of copulating their sexual organ with the mouth of Louise Van Eyk in violation of section 288a, Penal Code.

Each defendant entered a plea of not guilty to each charge. Hinton later withdrew his plea of not guilty to the first count and entered a plea of guilty thereto. Appellants and their attorney waived a jury trial. In effect, each defendant was found guilty of each count with which he was charged.

A résumé of the facts is as follows: At about 2:00 o'clock a. m., December 1, 1957, Louise Van Eyk was walking to her home on 17th Street in Los Angeles with a friend and neighbor, Patricia Marconi. When the two women were about half a block south of 12th Avenue an automobile driven by Hinton pulled into a driveway directly in front of them, thereby blocking the sidewalk. Two colored men, Jackson and Cozine, started to get out of the automobile. Mrs. Van Eyk and Mrs. Marconi started to cross the street, rather than to wait for the car to back out of the driveway.

When Mrs. Van Eyk was about one-half way across the street one of the men lunged at her. She screamed and started to run, however one of the men grabbed her and pulled her into the waiting car. Mrs. Van Eyk was white, married, twenty-two years old, of small stature, weighing about 95 pounds, and less than 5 feet in height. Each of the defendants was approximately 6 feet in height. During the struggle at this point, Mrs. Van Eyk lost one of her shoes. She bit a finger of one man. Mrs. Marconi was able to escape and did so. As she ran she looked back and saw the men dragging Mrs. Van Eyk into the car.

After Mrs. Van Eyk was in the car she continued to scream. She was hit several times and told to "shut up." One of her feet had not been pulled completely into the car and was lodged in the door when it was closed. The continued slamming of the door on her foot caused her to scream as they travelled along in the automobile. Hinton was driving the car and Jackson was riding in the front seat. Mrs. Van Eyk was on the floor in the front of the car and Cozine was in the back seat. One of the men shouted, "Shut that bitch up," following which she was struck on the face. Cozine kept

saying, "I want to shoot her," "Shoot the bitch," "I am going to shoot her, I will kill her if she doesn't shut up." The other men told him to "Put the gun away. She is being—she is quiet now, she is being good." After a considerable drive the car was parked and she was told to get out and keep her eyes down, which she did. She was taken to a wire mesh fence about six and one-half to seven feet high and was directed to climb it. Upon reaching the top of the fence one of the men lifted her off and placed her on the ground. She was again told to keep her eyes down and to make no sound, and was threatened with death if she made any noise. One of the men was in front and two were behind her as they walked along to a door of a building. She was ordered into the building.

When inside of the building one of the men started to pull off her coat; another of the men said, "No, she is going to do a strip. Leave the coat on. She will take it off herself."

The only persons in the house with Mrs. Van Eyk were the three defendants. A phonograph was started and she was directed to take her clothes off and she did so. She was then in the center of a room. She was told to dance, to shake and move her body, and to get down on the floor and lift up her legs.

The acts which thereafter were committed upon Mrs. Van Eyk by each of the defendants and the acts which she was compelled to perform are so lascivious, depraved and vicious as to be almost indescribable. No useful purpose could possibly be served by setting forth herein the revolting details of what took place, other than to say that the evidence amply and sufficiently sustains each charge against each defendant.

Other acts of violence also occurred which are not necessary to relate herein. Quite some time later Hinton reentered the room and Mrs. Van Eyk tried to explain that she was tired and wanted to go home, was worried and was in pain, and said she was "just begging for them to take me home." Hinton replied that, "the others have had it twice and I haven't." Whereupon he compelled her to commit a lecherous act and then had sexual intercourse with her.

Hinton ordered her to dress. She was taken out an exit other than the gate she had climbed to get into the house. As they left, Jackson was in front of her and Hinton was behind her. Jackson went into the street to see whether it was clear to take her out. She was then taken to a car and told by Jackson to get on the floor. Hinton drove the car.

During the ride Jackson forced her to commit another lustful act with him. The car was stopped and Jackson asked Hinton, according to Mrs. Van Eyk's testimony, "if he wanted to have me again before they threw me out." Hinton said, "No."

Jackson got out of the car and ordered her to get out and to walk in front of him with her eyes down. He then ordered her to run. She ran down the street and around a corner where she was found by two friends who were among those searching for her. It was then about 5:30 o'clock a. m. and the friends took her home.

While in police custody Jackson freely and voluntarily stated that he had been with Hinton and Cozine on the morning of December 1st, and that they had forced a girl into the car Hinton was driving; that she was taken to 4230 South Main Street, forced to undress and dance, that he had two acts of intercourse with her, and that he had committed other acts with her which constituted one of the crimes herein charged.

Cozine, while in police custody freely and voluntarily stated that while driving on the morning of December 1st, with Hinton and Jackson, Hinton driving, they had seen the two girls walking; that Hinton pulled the car into a driveway; that the girls were hailed; that he and Jackson got out and approached the two girls; that he did not grab the girl he approached, but that Jackson forced the other girl into the car against her will; that the car was driven to Cozine's house and that he, Hinton and Jackson had had intercourse with her.

Jackson and Cozine each asserted that the statements made by them to the police were not freely and voluntarily made; that the officers referred to them as "niggers" and they were put in fear and signed the statements only because of such fear.

It is also apparently the contention of the appellants that Mrs. Van Eyk had an opportunity to escape and did not take advantage of such opportunity, and that she could have made outcries (apparently louder than the evidence shows she did make), and that therefore this court should reverse the judgment.

Considering the matter of the confessions: In each instance in this case, the admission of a confession was preceded by a pre-showing of its free and voluntary character. The appellants made their showing at the time to the trial court claiming that there was force, fear or duress in securing their statements, and the judge evidently did not believe either of them. ". . . Where there is a conflict of evidence as to whether confessions had been freely and voluntarily made the determi-

nation of the question rests in the sound discretion of the trial judge, and if it is supported by substantial evidence his finding is binding upon a reviewing court. (*People* v. *Dolan,* 38 Cal.App.2d 96, 98 [100 P.2d 791]. . . .) The ruling of the trial court will not be disturbed on appeal unless there has been an abuse of discretion." (*People* v. *Cucco,* 85 Cal.App. 2d 448, 452 [193 P.2d 86].)

The evidence is amply sufficient to establish the convictions for each offense charged.

█ In *People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778], it was said:

". . . The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt . . . before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground' of insufficiency of the evidence, 'it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below. . . . We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict' . . . ."

The rule is applicable to kidnapping, as well as to other crimes. (*People* v. *Hight,* 94 Cal.App.2d 100, 105 [210 P.2d 270].)

█ The evidence as to the kidnappings heretofore set forth demonstrates without question that it sufficiently supports the convictions, and was sufficiently corroborated. Mrs. Marconi, who witnessed the abduction, told of being with Mrs. Van Eyk and as to how she was forcibly put into the car and transported. Officer Triggs further corroborated the story by testifying to the finding of one of Mrs. Van Eyk's shoes which was lost in the struggle, and further the signed statements of the appellants corroborated the story.

As to the rape charges, the defendants were charged with violation of subdivision 4 of section 261 of the Penal Code, which reads as follows:

". . . an act of sexual intercourse, accomplished with a female not the wife of the perpetrator, under either of the following circumstances:

". . . . . . . . . . . . .

"4. Where she is prevented from resisting by threats of great and immediate bodily harm, accompanied by apparent power of execution, . . . ."

■ Consent induced by fear is no consent at all. When a woman reasonably determines that she cannot resist without peril to her life or safety, no further resistance is demanded by the law. (*People* v. *Harris,* 108 Cal.App.2d 84, 89 [238 P.2d 158].) ■ The necessity of resistance is to be measured by all of the circumstances of the case, including the relative strength and ability of the persons, the uselessness of resistance and the degree of force manifested. (*People* v. *Burnette,* 39 Cal.App.2d 215 [102 P.2d 799]; *People* v. *Cassandras,* 83 Cal.App.2d 272, 278 [188 P.2d 546].)

Mrs. Van Eyk testified, "I was praying that I would live and that is all I was thinking about is that I could live through it, and I was doing everything I could to survive," and the record would seem to bear her out. As said in *People* v. *Harris, supra,* at page 89, "Her yielding to a superior force rather than suffer the possible consequences was more discreet than to cry up to the stars and be left in the gutter unconscious, if not dead."

■ Next considering the motions for a new trial: The only grounds urged for a new trial are that the verdict is contrary to the evidence within the meaning of subsections 6 and 7 of section 1181, Penal Code. The matter was addressed to the sound discretion of the trial court. We have found no abuse of that discretion. (*People* v. *Shaheen,* 120 Cal.App.2d 629, 640 [261 P.2d 752].)

■ No appeal lies from the order denying appellants' application for probation and the trial court's determination to deny probation constituted a proper exercise of discretion. (See *People* v. *Jackson,* 89 Cal.App.2d 181, 182 [200 P.2d 204]; *People* v. *Walters,* 148 Cal.App.2d 426, 427 [306 P.2d 606]; *People* v. *Jennings,* 129 Cal.App.2d 120, 123 [276 P.2d 124].) Indeed, from a reading of the record it is almost inconceivable that a defendant, under the circumstances related in this case, could secure probation. The defendants engaged in a course of conduct which demonstrated beyond question that they are vicious, depraved and corrupt beyond expression. In the writer's opinion the appellants are extremely fortunate to go to the state prison on concurrent terms; there are many places in the world today where the disposition would be very much less favorable to them.

The appellants' counsel in this matter has been of no assist-

ance to this court; in fact he has made our work more arduous than it would have been had no brief been filed. He failed to make even a semblance of compliance with rule 13 of the Rules on Appeal for the Supreme Court and District Courts of Appeal. He plainly violated both the spirit and the letter of the rules.

The attempted appeals from the orders denying the applications for probation, and the attempted appeals from the orders directing that the defendants be confined in the state prison are, and each is, dismissed.

The appealable judgments and orders denying motions for a new trial are, and each of them is, affirmed.

White, P. J., and Lillie, J., concurred.