[Crim. No. 16699. In Bank. June 21, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
ERNEST PEREZ, Defendant and Respondent.

COUNSEL

Richard H. Levin, under appointment by the Supreme Court, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Herbert L. Ashby, Chief Assistant Attorneys General, William E. James, Assistant Attorney General, S. Clark Moore and Norman H. Sokolow, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

McCOMB, J.—By an information, defendant and Curtis Vann were charged with sodomy (Pen. Code, § 286), and Carlos Rodriguez was charged with attempted sodomy and assault with intent to commit that offense. At defendant's request, his case was severed. After a court trial, he was found guilty of sodomy, and a jury subsequently found that he was sane at the time of the commission of the offense. He appeals from the judgment of conviction thereafter entered.

*Facts:* Viewed in the light most favorable to the People (*People* v. *Sweeney,* 55 Cal.2d 27, 33 [1] [9 Cal.Rptr. 793, 357 P.2d 1049]), the record shows, as follows:

The alleged offense occurred in the early morning hours of September 19, 1970, in a locked cell of the Ventura County jail occupied by six

persons: defendant, Charles K. (pathic participant in the offense), Vann, Rodriguez, and two other men. Of the inmates of the cell, only Charles K. and Vann testified regarding the alleged offense.

*Testimony of Charles K.*

Charles testified that at the time of the offense he was 18 years old, was not a homosexual, and had never previously engaged in a homosexual act. During the summer of 1970 following his high school graduation, he hitchhiked around the country, "seeing what the rest of the world looked like." On September 5 in Oxnard, he was arrested for the first time in his life and was held at the city jail on a charge of being under the influence of marijuana. He was unable to furnish bail. On September 8, he was transferred to a four-cell tank in the county jail. Each cell was locked at night and open to a common room during the daytime. The inmates selected their own cells. From the time Charles entered the tank, other inmates whistled and jeered in a homosexually suggestive manner and made comments about his long hair and remarks such as, "Gee, you're pretty." Charles was then 5 feet, 11 inches tall and weighed about 120 pounds.

Charles originally moved into Cell 4, but after an inmate of that cell kept saying, "There's an old man here with a long pole," and similar remarks, he moved to Cell 3. He described the inmates of that cell as "bullies," who subjected him to unspecified "personal persecution." He indicated, however, that sexual advances had been coming toward him from some of the occupants of the cell.[1]

While Charles was playing chess with defendant, who was an occupant of Cell 2, defendant kissed him on the mouth. Charles ran away from defendant, who told him a few minutes later that he was just trying to find out if Charles was homosexual. Thereafter, defendant told Charles that unless he moved into Cell 2 under the protection of defendant, Rodriguez, and Vann, he was going to be "rat-packed," and something would happen to him in Cell 3. Later Charles testified: "Rat packed . . . is where maybe a whole cell or even the whole tank goes in after you . . . [for the purpose of] [s]exual violence." About September 13, Charles moved into Cell 2.

Some time after midnight on September 18 (that is, during the early

---

[1]For instance, Charles testified that on one occasion while he was in the cell, he was looking for a comb and asked a new inmate for one. The new inmate started to comb Charles' hair, but Charles said he just wanted to borrow the comb. The new inmate then said that he would not lend the comb to Charles unless Charles climbed up on the bunk with him.

morning hours of September 19), Charles and Rodriguez were playing cards while the other inmates of the cell were in their own bunks. Charles estimated Rodriguez to be 5 feet, 7 or 8 inches tall, to weigh between 160 and 170 pounds, and to be between 35 and 40 years of age. Rodriguez "propositioned" Charles to have sexual intercourse, but Charles refused. Rodriguez then said that defendant and Vann had conspired to rape Charles forcibly, but that if Charles would submit to a simulated act of sodomy, they would think Charles was Rodriguez's "kid" and leave him alone. Charles assented to this. Rodriguez lowered Charles' trousers, took some Groom & Clean hair dressing from under Rodriguez's bunk, applied it to Charles' anal area, and simulated an act of sodomy. Rodriguez stopped abruptly when a man in one of the upper bunks sat up and looked at them.

Rodriguez then went to defendant's bunk, and they conversed in Spanish. Afterwards, defendant, dressed in a T-shirt and underwear-type shorts, came to the bunk where Charles was. He started dealing cards, as though he had come over to have a card game with Charles; but he then told Charles they should "get down to business" and that Charles should lie down on the bunk. At first, Charles refused, but he then submitted unwillingly and in fear after defendant told him that if he did not, he would be "on his own," without protection, and that he knew the circumstances involved with Cell 3 especially and with the rest of the jail. Defendant applied Groom & Clean to Charles' anal area and committed sodomy. Charles groaned in pain and told defendant to stop it, because it hurt and also because he did not believe in it. Defendant, however, continued, telling Charles to be quiet.[2]

After defendant went away, Vann came over to the bunk. Charles grabbed his trousers and started to pull them up, but Vann kept pulling them down, resulting in almost a tug of war between them. Vann told Charles to lie down or he would hit him. Charles refused, and Vann hit him, knocking him unconscious for a moment. When Charles regained consciousness, Vann was committing sodomy on him.

With further reference to the act between himself and defendant, Charles testified that he was afraid, saying he "was afraid of everybody and everything at the time." He said he was afraid they would beat him up and possibly kill him if he told anyone.

The next morning, Charles did not take the initiative in reporting the

---

[2]The record shows that at the time of the trial (less than 10 months after the alleged offense) defendant was 36 years of age.

criminal incidents to jail officers because he was still in fear, since after committing sodomy defendant had said that if Charles told anyone of the offense, defendant would beat him up and remove his protection and he might be "rat-packed." Later in the day, an officer took Charles from the tank and informed him that he was investigating a reported incident which had occurred in Cell 2. The officer did not "pressure" him; but Charles, although still afraid, decided to, and did, make a statement as to the alleged offenses.

*Testimony of Vann*[3]

Vann testified that he was 5 feet, 9½ inches tall and weighed 185 pounds. On the night of September 18, 1970, past midnight, he saw Rodriguez and then defendant commit sodomy on Charles. While defendant was engaged in the crime, Vann lay in his bunk and watched so that he could warn defendant and Charles to stop what they were doing if officers came into the tank. Vann then approached Charles, but Charles, according to Vann's testimony, refused him because he was black. Vann admitted that he knocked Charles out and started to commit sodomy on him, but said that he could not go through with it.

*Arguments in trial court*

Defense counsel commenced his argument on the merits of the case with the statement, "It appears to me, your Honor, that the first question that should be resolved in the Court's mind is whether or not [Charles] is an accomplice as a matter of law in the alleged act about which he testified." He, of course, argued in the affirmative and then urged that Vann was also an accomplice as a matter of law, as a result of which his testimony could not constitute corroboration of Charles' testimony, and that there was virtually no other evidence which could constitute corroboration.[4] In conclusion, he stated, "On that basis I would ask for an acquittal."

---

[3]Vann was brought from imprisonment at Tracy to testify at defendant's trial. Because of the possibility of self-incrimination, the public defender represented him during his testimony.

[4]The only other possible corroborative evidence consisted of the following: A sheriff's detective assigned to the case on September 21 searched Cell 2 on that day and found, under the mattress of Rodriguez's bunk, a comb, a handkerchief, and a tube of Groom & Clean; but he testified that each prisoner is allowed to purchase any brand of hair cream sold in the jail commissary and to keep it in his cell.

Dr. Puls, a physician, examined Charles on or soon after September 19 and discovered redness and irritation outside his rectum; but he said that they could have been caused by sweating or infection and that there was "no undue irritation or

The prosecuting attorney argued, among other things, that Charles, a young, inexperienced 18-year-old boy, who had just finished high school, engaged in his first taste of real life experience hitchhiking around the country, been arrested and put in jail for the first time in his life, and, with his long hair, had a somewhat effeminate appearance, had submitted under duress and out of fear and was not an accomplice. The prosecuting attorney argued that when Charles found himself locked in the cell with five other people, "he was, in effect, like the proverbial lamb in the den of wolves."

By finding defendant guilty, the trial court found by implication that Charles was not an accomplice or, in the alternative, that Charles was an accomplice but that Vann was not an accomplice and hence his testimony corroborated Charles' testimony.

■ *Questions:* First. *Is there sufficient evidence to support the trial court's findings?*

*Yes.* By the terms of section 1111 of the Penal Code, the testimony of an accomplice must be corroborated.[5] Under the circumstances here present, however, the trier of fact could reasonably have inferred that Charles was not an accomplice and that his testimony therefore constituted a sufficient basis for finding defendant guilty.

Under section 26, subdivision 8, of the Penal Code, the defense of duress is available only to those "who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their *lives would be endangered* if they refused." (Italics added.) Although a number of cases in this state have held that the fear must literally be of *death, People* v. *Otis,* 174 Cal.App.2d 119, 124 [344 P.2d 342], suggests that the fine distinction between fear of danger to life and fear of great bodily harm is unrealistic. According to *Otis* (quoted approvingly in *People* v. *Lo Cicero,* 71 Cal.2d 1186, 1191 [80 Cal.Rptr. 913, 459 P.2d 241]), however, the threat must be of present,

---

redness . . . there was nothing marked there." Anoscopic examination of the inside of the rectum revealed no bleeding, lacerations, or irritation, "no unusual findings."

In view of the conclusion reached herein, we do not need to determine whether this evidence would have been sufficient to corroborate Charles' testimony if he had been found to be an accomplice.

[5]Section 1111 of the Penal Code reads: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

"An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

immediate harm, not future violence. Here, by Charles' own testimony, when he submitted to defendant there had been no threats of immediate violence from the inmates of Cell 2; Charles feared that he would be subjected to violence and might even be killed, but defendant's only threats had been that Charles' protection from future attacks by other inmates would be removed and that if he told anyone of the offense, defendant would beat him.

However, in *People* v. *Anderson,* 264 Cal.App.2d 271 [70 Cal.Rptr. 231], involving sodomy committed upon a 16-year-old boy, it is pointed out at page 274: "The cases in this state have greatly broadened the situation under which a person participating in the forbidden acts under threats of great bodily harm should not be considered an accomplice." And at pages 276-277 it is stated: "Furthermore, a principle has been developed, not by statute but by case law, which makes the factors involved lead to a conclusion that the boy was dominated by the older person, and that he assented rather than consented to the various improper acts involved in the charge against the defendant. *People* v. *Westek,* 31 Cal.2d 469 [190 P.2d 9], suggests that a boy is not an accomplice if he is simply afraid of the older person and dominated by him. The fear referred to in the opinion is not closely defined, but it apparently does not mean necessarily fear of death or even of great bodily harm. In that case, the defendant was prosecuted for violation of Penal Code sections 288 and 286; all of the boys involved were under the age of 14 years, and it was held that they could not be accomplices under section 288 of the Penal Code, but that they could be under section 286 if they participated knowingly in the forbidden acts; there was evidence in the case that the boys knew that the acts were wrongful, and the court, therefore, treated them as potential accomplices in spite of their ages. The Supreme Court held, however, that where the boys participated in the acts because they were afraid of the defendant and were dominated by him, they merely assented instead of consenting to them and, therefore, they could not be considered accomplices."

█ It is further said in *Anderson* at pages 275-276: "In *People* v. *Olds,* 154 Cal.App.2d 78, 81-82 [315 P.2d 881], the applicable rule is thus discussed:

" ' "To be an accomplice one must knowingly, voluntarily, and with common intent unite with the principal offender in the commission of the crime." (*People* v. *Lamb,* 134 Cal.App.2d 582, 585 [285 P.2d 941]; *People* v. *Shaw,* 17 Cal.2d 778, 799 [112 P.2d 241].) This requires consent, which is defined in *People* v. *Dong Pok Yip,* 164 Cal. 143, at page 147 [127 P. 1031] as follows: "Consent, in law, means a voluntary

agreement by a person in the possession and exercise of sufficient mentality to make an intelligent choice, to do something proposed by another. 'Consent' differs very materially from 'assent.' The former implies positive action and always involves submission. The latter means mere passivity or submission, which does not include consent." In *People* v. *Westek,* 31 Cal.2d 469 [190 P.2d 9], which concerned a violation of the same section of the Penal Code here involved, the court pointed out (p. 475) that "The jury apparently accorded full credit to the boys' testimony that they did not 'willingly' join in the criminal acts, and so concluded that their part therein constituted an 'assent' rather than a 'consent.' Consequently, the boys, by virtue of the evidence accepted by the jury as true, were not accomplices and corroboration of their testimony was not necessary." In *People* v. *Featherstone,* 67 Cal.App.2d 793 [155 P.2d 685], which also involved a violation of this same code section, the court observed (p. 796) that "If he (a fifteen-year-old boy) was not an accomplice, corroboration of his testimony was not necessary."

" 'It was for the arbiter of the facts to determine whether Ronald consented to and wilfully joined in the criminal act defendant committed. Of course on appeal we must accept as established·every fact in harmony with the judgment that finds adequate support in the evidence.'

*"People* v. *Washington,* 203 Cal.App.2d 609, 610 [21 Cal.Rptr. 788], similarly discusses the principles involved as follows:

" 'One of the victims testified that after robbing her, defendant forced her at the point of a knife and while she was in great fear of bodily harm therefrom to engage in an act in violation of section 288a, Penal Code, and then, while still in such fear, forced her to have sexual intercourse with him. Consent induced by fear is no consent at all. (*People* v. *Hinton,* 166 Cal.App.2d 743, 749 [333 P.2d 822].) Also, one who "participates in an act of sex perversion because of threats and is in fear of great bodily harm is not an accomplice and such victim's testimony need not be corroborated." [Citation.] Whether one is an accomplice is a question of fact.' "

Likewise, in *People* v. *Brown,* 6 Cal.App.3d 619, 624 (6) [86 Cal. Rptr. 149], which also involved the crime of sodomy, it was said: "Participation induced by threats and fear of bodily harm removes one from an accomplice category."

██ In the present case, the trial court recognized that when a young man has been subjected to acts of sexual perversion, "his age and background, his sophistication, his maturity or immaturity, things of that sort"

are significant in determining the degree of threat he felt; and, under the circumstances here shown, the trial court could reasonably have inferred that Charles did not consent to participate in the act, but "assented" through fear of great bodily harm, and hence was not an accomplice.

As hereinabove pointed out in the quotation from *Anderson,* we must accept as established every fact in harmony with the judgment that finds adequate support in the evidence; and there is adequate evidence here to support findings in harmony with the judgment.

■ Second. *Did the trial court apply the proper test of sanity?*

*Yes.* Defendant contends that the court erroneously construed the word "wrong" in the right-and-wrong test for sanity, in that the court indicated it referred to legal wrong and not to both legal and moral wrong. It is "wrong" in the legal sense, however, that is contemplated in the sanity test. (*People* v. *Nash,* 52 Cal.2d 36, 50 [338 P.2d 416]; see also *People* v. *Wolff,* 61 Cal.2d 795, 801 [40 Cal.Rptr. 271, 394 P.2d 959].)[6]

■ Third. *Did the trial court abuse its discretion in denying defendant's motion for funds to investigate the possibility of jury misconduct?*

*No.* One of the jurors composed a poem, which happened to fall into the hands of defense counsel after the jury had returned its verdict. Defendant contends that the poem is concrete evidence that misconduct was present and that the trial court therefore abused its discretion in refusing to grant funds to investigate such a possibility.

■ With respect to alleged jury misconduct, where questions of fact are presented for the trial court (as by affidavit) its findings will be upheld in the absence of a showing that its discretion was clearly abused. (*Bardessono* v. *Michels,* 3 Cal.3d 780, 795 (12b) [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) ■ No showing of abuse has been made here. To begin with, there is no evidence that any of the other jurors even saw the poem. In any event, this court has read the poem and has concluded that it was not such as to warrant an investigation of jury misconduct. Moreover, the alleged misconduct was entirely speculative in nature, and it is settled that the denial of a constitutional right resulting in essential unfairness must be established as a demonstrable reality, not

---

[6]Thus, in *Nash* it was said: "The law as it is now understood and applied in California recognizes that all men are not endowed with equal intellectual capacity or similar moral convictions, but *it requires, for the protection of society, that all conform to certain minimal standards of social interaction* . . . . Although *the law requires compliance with its standards* by all persons it does not impose criminal sanctions on all persons." (P. 50 of 52 Cal.2d; italics added.)

as a matter of speculation. (*Darcy* v. *Handy,* 351 U.S. 454, 462 [100 L.Ed. 1331, 1337-1338, 76 S.Ct. 965].)

The judgment is affirmed.

Wright, C. J., Tobriner, J., Mosk, J., Burke, J., Sullivan, J., and Clark, J., concurred.